# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BERTRAND CAPEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-0897 (ABJ) |
| | ) | |
| KAREN WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Bertrand Capel brought this action against defendant Karen Wright, a former romantic partner, alleging breach of contract, breach of the duties owed to a business partner, and conversion in connection with real property in the District of Columbia: 1322 E Street, NE ("the Property"). Am. Compl. [Dkt. # 17] ¶¶ 6, 51–68. Defendant responded with three counterclaims against the plaintiff: unjust enrichment, tortious interference with a contract defendant had entered into to sell the property, and conversion. Def.'s Answer to Compl. [Dkt. # 2] ¶¶ 38–61.

Plaintiff has filed a motion for partial summary judgment as to liability on Count Two, the breach of contract claim. Pl.'s Mot. for Partial Summ. J. [Dkt. # 20] ("Pl.'s Mot.") at 1. Defendant opposed the motion and filed a cross-motion for summary judgment in her favor on all of plaintiff's claims as well as her counterclaims for tortious interference and conversion. *See* Def.'s Opp. to Pl.'s Mot. and Cross-Mot. for Summ. J. [Dkt. # 22] ("Def.'s Cross-Mot."). Plaintiff opposed defendant's cross-motion, and both motions are fully briefed. *See* Pl.'s Combined Reply to Def.'s Opp. to Pl.'s Mot. and Opp. to Def.'s Cross-Mot. [Dkt. # 23] ("Pl.'s Reply"); Def.'s Reply in Supp. of Def.'s Cross-Mot. [Dkt. # 25] ("Def.'s Reply").

This case is yet another iteration of an age-old cautionary tale:  if you go into business with a friend, relative, or lover, you'd better write everything down.  The record establishes that defendant Wright purchased a property in an up-and-coming neighborhood in D.C., the couple renovated the Property, plaintiff Capel played some role in overseeing the renovation, and the pair lived in the house together for a period of time.  But the defendant moved out to live with her mother in Texas, plaintiff stayed in the house, and the relationship cooled.  Eventually, the defendant wanted to receive more per month for plaintiff's tenancy than he was willing or able to pay, defendant made plans to sell the Property, and plaintiff dug in his heels.  The cross motions are based on the parties' shifting and conflicting accounts of what their expectations and agreements were going into the defendant's purchase of the property; what, if anything, the plaintiff was entitled to receive for his efforts and unreimbursed expenditures – if any – in connection with the renovation; and whether he is entitled to a share in the proceeds if the property, which has appreciated in the meantime, is sold.  At this stage of the proceedings, and after a full opportunity to pursue and produce discovery, the Court finds that plaintiff is unable to make his case.  His efforts to retroactively mold what was a distinctly un-businesslike arrangement into recognizable legal constructs such as a contract or a partnership agreement have failed, given the absence of the signature element of an enforceable agreement:  a meeting of the minds.  Indeed, it is plaintiff's own deposition testimony about how vague it all was at the time that plays the greatest role in undermining his claims.

For the reasons set forth in more detail below, plaintiff's motion for partial summary judgment on Count Two, his breach of contract claim, is **DENIED,** and defendant's cross-motion for summary judgment on **Counts Two, Three,** and **Four,** plaintiff's breach of contract, breach of partnership duties, and conversion claims, will be **GRANTED**.  Given that, the request in **Count**

**One** for a declaration that plaintiff is owed specific amounts by virtue of the alleged contract, partnership, or investment in the Property, falls as well.  With respect to defendant's counterclaims, defendant's cross-motion for summary judgment is **GRANTED in part** as to liability on **Count Two,** tortious interference with her contract to sell the house, and **DENIED** as to **Count Three**, conversion.  The Court also concludes that it must *sua sponte* **GRANT** summary judgment for plaintiff on **Count Three**, defendant's counterclaim for conversion.  The question of damages owed to the defendant remains undetermined.

## FACTUAL BACKGROUND

Plaintiff and defendant began their long-term romantic relationship in 2005.  Pl.'s Statement of Undisputed Material Facts [Dkt. # 20] ("Pl.'s SOF") ¶ 1; Def.'s Statement of Facts [Dkt. # 21-1] ("Def.'s SOF") ¶ 1, citing Ex. 1 to Def.'s Mem. in Opp. [Dkt. # 21-3] ("Wright Decl.") at ¶ 3.  Over the course of the relationship, the couple lived together at several different addresses in the District of Columbia.  Pl.'s SOF ¶ 1; Def.'s SOF ¶¶ 2, 3.

When the defendant began looking to purchase a home in 2013, plaintiff accompanied her to open houses and tours.  Def.'s SOF ¶ 11; Pl.'s Resp. to Def.'s SOF [Dkt. # 23-1] ("Pl.'s Resp. SOF") ¶ 13.  Plaintiff identified the Property on E Street NW and considered it "promising" for defendant, so he encouraged her to visit it.  Def.'s SOF ¶ 16; Pl.'s Resp. SOF ¶ 16.  Defendant states that while the parties discussed her desire to purchase a home when they were in a relationship, they "never discussed an intent to purchase a property together."  Def.'s SOF ¶ 10, citing Wright Decl. ¶ 11.[1]

---

1       Plaintiff disputes this statement as well as any statements that "mischaracterize[] [d]efendant's search for a home as a sole endeavor."  Pl.'s Resp. SOF ¶¶ 10, 16, 17.  With this and many other Statements of Fact, the parties quibble over immaterial aspects of the story; searching for a home together is not the same thing as "purchasing" a home together.

On May 8, 2013, defendant purchased the Property for $545,000; it is undisputed that she paid the down payment using her personal assets and she was the sole individual listed on the title and mortgage.  Def.'s SOF ¶ 18, citing Wright Decl. ¶ 18 and Ex. 2 to Def.'s Cross-Mot. [Dkt. # 22-4] ("Capel Dep.") at 17:4–15; Pl.'s Resp. SOF ¶ 18; *see also* Capel Dep. at 40:1–41:16 (testifying that his name was never added to the deed or the mortgage).

According to the plaintiff, though, the parties agreed to purchase the Property "together." Pl.'s SOF ¶ 4.  He states that in the car on the way to an unidentified open house, on an unspecified date, the parties reached a verbal agreement that "[i]n the event they decided to sell the property" he would be entitled to thirty percent of the profits.  Pl.'s SOF ¶ 7, citing Ex. C to Pl.'s Mot. [Dkt. # 20-3] ("Pl.'s Resp. to Def.'s Interrog.") at 3-4, 12-13.  He also claims that the parties agreed that he would "recoup his share of renovation costs."  Pl.'s SOF ¶ 8, citing Pl.'s Resp. to Def.'s Interrog. at 3-4, 12-13, and Capel Dep. at 21.

The defendant denies that the parties ever agreed to purchase the Property together, Def.'s Resp. SOF ¶¶ 4, 5; denies there were any agreements that plaintiff would receive a share of any profits if the house were sold; Def.'s Resp. SOF ¶ 7; and denies that they ever agreed that plaintiff would contribute anything toward the renovation costs or recoup those costs.  Def.'s Resp. SOF ¶ 8.  Rather, she states that he "conveyed full knowledge that this house would be Ms. Wright's sole property and she was the named party for all utility bills and home insurance."  Def.'s SOF ¶ 19.  She states that at the time of purchase, she intended to live in the house for at least a few years, but had not considered what would happen if she moved.  Def.'s SOF ¶ 20.

Plaintiff takes the position that these proposed statements of fact are mischaracterizations and "impermissible legal conclusions."  Pl.'s Resp. SOF ¶¶ 15, 19.  However, at his deposition he

testified, "if she wanted to sell it, she could have sold it."  Capel Dep. at 54:2–3.  He also revealed

that notwithstanding his hopes and expectations, there was no agreed upon plan:

> Q: So if she had sold that house during that discussion that you had where
> you claimed she offered you 50 percent, and it didn't generate any profits
> for you, were you going to get anything for the house, personally?
>
> A: I would have kept what I put into the house, I guess, and that's it. And if
> we're lucky, you know, maybe a little bit more.
>
> Q: When you say –
>
> A: I was trying –
>
> Q: When you say you would get what you "put into the house," what do you
> mean by that?
>
> A: Make the money I spent on the construction.
>
> Q: When did you-all discuss that you would get that the money back?
>
> A: Like I say, we didn't. There was no definite plan.
>
> Q: So you-all never talked about you getting your construction expenses
> back?
>
> A: No.

Capel Dep. at 54:15–55:13.  Plaintiff also testified that they never discussed whether the house

would be sold, when it would be sold, or the type of profit they expected to earn from the house.

Capel Dep. at 27:8–30:5; *see also* Capel Dep. 37:18–38:3 ("Q: When you-all finished the

renovations on the property, did you have any discussion about how long you would keep it for?

A: No. No. It was -- everything was up in the air.").[2]  When asked whether he would have received compensation if the defendant chose not to sell the Property, he responded, "[w]ell, I mean, you know, the question never came to my mind because, I guess, the plan was we were going to stay in it and live in it forever," but he added,  "I mean, I knew at some point we were going to sell it, probably."

> Q: How did you know that?
>
> A: I mean, I don't know it for sure. I'm just guessing that, at some point, how you want to sell it and move to a different neighborhood, maybe . . . or we stay there forever. There was not an exact plan.

Capel Dep. at 28:11–29:4.

The renovations on the Property took approximately seven months.  Pl.'s SOF ¶ 9; Def.'s Resp. SOF ¶ 9.  Defendant states that she "entrusted [plaintiff] to coordinate with contractors for aspects of the renovations, but throughout this process she paid contractors directly and encouraged [plaintiff] to notify her if he ever spent money on the project, for which she would, and did, immediately reimburse him."  Def.'s SOF ¶ 23.  Defendant also states that she "discussed

---

2      *See also* Capel Dep. at 26:1–26:12:

> Q: What did you understand the plan to be for once the renovations were completed on the house?
>
> A: The plan was to live in the house until we decided another way.
>
> Q: How long do you think?
>
> A: You know, I thought, at the time, you know, maybe for a couple of years. You know, if we want to sell it down the road, sell it and get something else. We didn't have a definite plan.
>
> Q: So you-all never decided when or if you could actually sell the house?
>
> A: No.

6

the potential to compensate [plaintiff] for this role as effectively a general contractor, with any compensation to be paid if she sold the Property."   Def.'s SOF ¶ 24.   She states that plaintiff informed her that general contractor fees were "typically ten to fifteen percent of the total renovation costs," but she points out that plaintiff was not handling all of the responsibilities of a general contractor such as identifying, hiring, and supervising subcontractors and the budget, but "merely assisting" defendant in handling those tasks.   Def.'s SOF ¶ 24.   According to the defendant, the parties "did not agree to a general contracting fee – or indeed, any specific fee – for the limited services [plaintiff] would provide for the renovations."   Def.'s SOF ¶ 24.   Plaintiff assisted defendant in "creating a budget for the renovation costs, which totaled $88,000," and he did not include any fees that he would receive in the calculation.   Def.'s SOF ¶ 24.   Plaintiff disputes these statements, and notwithstanding the fact that he cites his own interrogatory answers as support for his statements of fact, he takes the position that defendant's declaration, standing alone, is not enough to establish hers.   Pl.'s Resp. SOF ¶¶ 23–24.

While plaintiff states that both parties expended funds from their respective personal accounts to finance the renovation, Pl.'s SOF ¶ 9, defendant emphasizes that plaintiff did not expend any of his own funds toward the renovations "beyond what he promptly reported to Ms. Wright and was reimbursed at the time."   Def.'s Resp. SOF ¶ 9; Def.'s SOF ¶ 23.[3]   She states that

---

3       Plaintiff supports his Statement of Fact ¶ 9 with Exhibit E to his motion for partial summary judgment, Dkt. # 20-5, which he describes as "a few of the many examples of contractor quotes and receipts showing Bertrand and Karen's joint renovation efforts."   Pl.'s SOF ¶ 9.   This incomplete and unexplained compilation of illustrative materials includes quotes provided by contractors and vendors that do not bear any indication as to who paid them, emails or receipts reflecting payments received by vendors, a few documents with handwritten annotations reflecting payments by plaintiff or defendant or both, and some receipts for cash purchases.   *See* Ex. E to Pl.'s Mot. [Dkt. # 20-5].   The Exhibit does tend to show "joint renovation efforts," but it is not enlightening on the question of whether plaintiff was reimbursed for any funds he advanced, or what the arrangement was, if any, as to his being paid for whatever oversight or management role he was performing.

"according to all available billing records at the time," the renovations cost $119,526.40, which included "all costs [plaintiff] reported to [defendant] and which she had reimbursed to him." Def.'s SOF ¶ 30. The record does not include any records reflecting that plaintiff presented receipts to defendant for reimbursement or records of payments from defendant to the plaintiff. Defendant further states that the total amount was "significantly higher than the budget Mr. Capel originally helped her write up, but she still wanted to compensate him for helping with the renovations." Def's SOF ¶ 30. She was not able to do so at the time due to her "limited . . . available funds," but she states that plaintiff told her, "no problem, Karen, you can pay me when you sell the property." Def.'s SOF ¶ 30. According to the defendant, plaintiff mentioned "a general contracting fee [that] would have cost Ms. Wright ten to fifteen percent of her renovation expenses, but they did not determine what number she would eventually pay him for his assistance." Def.'s SOF ¶ 30.

In response to defendant's statement of facts, plaintiff disputes defendant's statement concerning the open-ended nature of the understanding. *See* Pl.'s Resp. SOF ¶ 30. But when asked at the deposition if the parties discussed the details of the reimbursement, he testified that they "just poured money into the house and that's it;" "we were not thinking about, you know, what am I going to get, or what is she going to get; we did this as a couple." Capel Dep. at 56:3–56:16. Plaintiff denies that he was ever reimbursed for his expenses, and he alleged in the Amended Complaint that he contributed $49,610.32 of his own funds to the renovation. Pl.'s Resp. SOF ¶ 30; Am Compl. ¶ 50. He testified in his deposition, though, that in 2017, he reported to the plaintiff a number between $30,000 and $35,000, Capel Dep. at 227:18–20, and he estimated in a July 2018 email to the defendant that it was $25,000 to $30,000. Pl.'s Resp. to Def.'s Interrog.

[Dkt. # 20-3] at 14.[4] He also testified that he did not tell defendant how much he spent at the time the renovations were complete because "[i]t didn't come to [his] mind," they "were just happy to finish the renovation and be in the house," although he thought that "[a]t some point, [they were] going to have to add all the receipts." Capel Dep. at 229:6–17.

After the renovations were substantially complete, plaintiff moved into the Property. Pl.'s SOF ¶ 10; Def.'s Resp. SOF ¶ 10. The defendant continued living in a different condominium but moved into the Property a few months later, in March 2014. Pl.'s SOF ¶ 10; Def.'s Resp. SOF ¶ 10; Def.'s SOF ¶¶ 27, 31. The parties disagree as to the circumstances of their living arrangement and plaintiff's payments. Defendant states that when plaintiff first moved in, he "paid rent that [she] set at $2,750, which was approximately the base amount of her mortgage." Def.'s SOF ¶ 28. Plaintiff disputes this and states that the agreement was that he would "pay the mortgage." Pl.'s Resp. SOF ¶ 28. He testified, though, that he would pay defendant monthly, and then she paid the mortgage lender; he also stated that his name was never added to the mortgage or deed for the house. Capel Dep. at 40:1–41:16. Defendant states that the parties "restarted" their romantic relationship while living together from March 2014 through October 2014, and that she reduced plaintiff's rent payments to half of the previous rate "given that he no longer had sole occupancy of the house." Def.'s SOF ¶ 33, citing Wright Decl. ¶ 32.

In October 2014, defendant moved to Texas to take care of her ailing mother. Pl.'s SOF ¶ 11; Def.'s Resp. SOF ¶ 11. Plaintiff continued living in the Property for several years, during which the parties saw each other periodically. Pl.'s SOF ¶ 12; Def.'s Resp. SOF ¶ 12. Defendant

---

[4] Other than the set of quotes and random receipts that comprise Exhibit E to plaintiff's motion for partial summary judgment, some of which, even according to plaintiff, were paid by the defendant, *see* Pl.'s SOF ¶ 9, plaintiff has not come forward with documents supporting any of these totals.

claims that she "understood the rental situation to be a month-to-month arrangement until Mr. Capel would be more financially solvent," Def.'s SOF ¶ 36, while plaintiff disagrees with that assertion and states that he "paid the mortgage and lived [in] the house pursuant to their original agreement." Pl.'s Resp. SOF ¶ 36. Unsurprisingly, the parties also disagree about how to characterize the nature of their relationship during that period of time. Pl.'s SOF ¶ 12; Def.'s Resp. SOF ¶ 12.

Defendant states that in 2016, she informed plaintiff that she wanted him to "increase his monthly rental payment to $3,250, an amount closer to the market rental value," but plaintiff "complained that he could not afford [that] amount." Def.'s SOF ¶ 39. She asserts, pointing to text messages from the time, that she proposed that he get a co-tenant or rent out a room in the house so that he could afford the higher price. Def.'s SOF ¶ 40.[5] Defendant states that plaintiff refused to move out unless she paid him $25,000, which he considered to be "the contracting fee for the renovations he helped with years before." Def.'s SOF ¶ 41. According to the defendant, "[o]ther than the vague conversations the parties had about what a typical general contractor fee would be, they never discussed any specific compensation for him for his assistance with the renovations and they certainly did not agree to a fee of $25,000." Def.'s SOF ¶ 41. She acknowledges that they "had agreed that she would compensate him for his efforts whenever she sold the home," but she "denied that [he] was entitled to the amount of $25,000 he claimed or that he had a right to stay in the Property unless she paid him his demanded fee." Def.'s SOF ¶¶ 41, 42.

Defendant states that she "compromise[d] with [plaintiff's] paying a small increase of rent to $2,850 because her property taxes increased," and that this was "contingent [on an agreement]

---

5    Plaintiff's statement of material undisputed facts points to a text message from June 25, 2016, in which defendant suggested to plaintiff that he should "Airbnb a room in the house to make extra money." Pl.'s SOF ¶ 13, citing Pl.'s Resp. to Def.'s Interrog. at 19.

that the difference between the $2,850 and the market rate of $3,250 would [be] offset against the fee they would eventually settle on."  Def.'s SOF ¶ 44.  Plaintiff disputes these statements and insists that he "paid the mortgage and lived in the house, per their original agreement."  Pl.'s Resp. SOF ¶¶ 39–44.

The parties have summarized some of their text messages and appended others to their pleadings.  According to the defendant, on April 20, 2017, plaintiff texted her that "he was entitled to thirty percent of the profit on the Property and also claimed for the first time that he had paid renovation expenses that had never been reimbursed."  Def.'s SOF ¶ 49.  Plaintiff testified in his deposition that sometime in 2017, he told defendant that his renovation costs were $30,000 to $35,000.  Pl.'s Dep. at 227:18–20.[6]

Plaintiff maintains that email communications from July 27 through July 30, 2018 between the parties reveal discussions that defendant would "buy [him] out of his share of equity in the house."  Pl.'s SOF ¶ 16.  But most of that language was on his part.  Plaintiff asked defendant if she wanted to rent the house, and he added, "[i]f you do, why don't you get an equity loan and buy me out . . . ."  Pl.'s Resp. to Def.'s Interrog. at 14 ("July 2018 Emails").  Defendant responded, "[w]hen you say buy you out how much are you thinking?", to which plaintiff stated, "[w]hat ever we agreed from day one 30 percent of the profit plus whatever I spend on the labor and materials."  July 2018 Emails.  Defendant asked how much plaintiff had spent on labor and materials, but did not address the reference to sharing the proceeds of the sale.  *See* July 2018 Emails.  Plaintiff

---

6    Plaintiff's Statement of Facts includes the fact that on June 17, 2017, defendant sent him a text message stating, "[i]f we can keep the house for another 10 years we will be billionaires." Pl.'s SOF ¶ 15, citing Pl.'s Resp. to Def.'s Interrog. at 13.  He does not cite or rely upon this statement in connection with any of the claims, though.

estimated that he spent between $25,000 and $30,000, but he noted that he did not "have a lot of the receipts as . . . a lot of those other contractors wanted cold hard cash."  July 2018 Emails.

Defendant states that on May 15, 2019, she notified plaintiff that she wanted to rent the Property out for more money.  Def.'s SOF ¶ 51.  The record reflects that in late June of 2019, the defendant informed the plaintiff that it was time for him to move out in favor of a new tenant, and she proposed to pay him $63,000, based on "math" that was otherwise not described, although she opined that the home was worth $880,000.  *See* Pl.'s Resp. to Def.'s Interrog. at 4.  Plaintiff, who had previously asked for $67,000, offered to "settle at 64k so we don't hit a road block."  Pl.'s Resp. to Def.'s Interrog. at 4.  Defendant replied, "Hmmm OK : (."  Pl.'s Resp. to Def.'s Interrog. at 4.  At that point, plaintiff insisted that he needed to see the money in his account before he would move out.  *See* Pl.'s Resp. to Def.'s Interrog. at 4.  Defendant responded:  "[y]ou don't have any interest in the property either way. Real estate is contract law. I'm just doing this to be nice."  Pl.'s Resp. to Def.'s Interrog. at 4.

As time went on and it became more difficult to identify a tenant willing to pay the rent defendant was seeking, she began to muse about whether it made more sense to continue to try to rent the property or to sell it the next spring.  *See* Oct. 2 – 29, 2019 Text Messages, Ex. F to Pl.'s Reply [Dkt. # 23-2] ("Text Messages") at CAP0054–CAP0055.  Defendant states that in the fall of 2019, plaintiff provided receipts "in support of his supposed $49,000 expenditures," but that these receipts corresponded to costs that she or contractors had previously paid, and they did not show that plaintiff had paid anything beyond what she reimbursed him for in 2013 and 2014.

Def.'s SOF ¶ 53.[7] Defendant did not pay plaintiff anything in response to these new requests, and in January 2020, plaintiff moved out of the Property and renters moved in. Pl.'s SOF ¶ 18; Def.'s SOF ¶ 59. In January of 2020, there was some discussion about defendant's taking out a home equity loan to obtain funds to use to pay the plaintiff, and/or her paying him a fee as a vendor to manage the property. *See* Text Messages at CAP0055.

In January of 2021, when plaintiff learned that the house was about to go on the market, he asked defendant to confirm in writing that he would be paid from the settlement proceeds. Text Messages at CAP0055. While defendant assured the plaintiff that she would pay him, she did not agree to put it in writing. Text Messages at CAP0055. In February 2021, defendant listed the Property for $975,000, and the house went under contract for $970,000. Def.'s SOF ¶¶ 64, 66; Am. Compl. ¶ 46.[8] According to the defendant, the sale could not be finalized because plaintiff sued her and filed a *lis pendens* on the Property, so "the Property did not have a clear title[,] and the buyer's lender would not allow the deal to proceed." Def.'s SOF 67–68.[9]

## PROCEDURAL HISTORY

On February 26, 2021, plaintiff filed his initial complaint in D.C. Superior Court alleging breach of contract, breach of the partnership duties, and conversion, along with a handwritten form requesting injunctive relief. *See* Ex. A to Notice of Removal [Dkt. # 1-2] ("Compl."). On February

---

7       Plaintiff testified that the $49,000 includes $25,000 in cash that he kept in a safe deposit box at defendant's bank and used to pay some contractors during the renovation process, but that he does not have receipts for all these transactions and cannot provide any documentation verifying how much cash the deposit box contained. Capel Dep. at 74:20–21, 76:9–21; July 2018 Emails.

8       Plaintiff disputes this statement because "[d]efendant's own Declaration does not prove the truth of the statements made in this paragraph." Pl.'s Resp. SOF ¶ 64.

9       Plaintiff testified that he knew that a *lis pendens* would block the sale of the property from being finalized. *See* Capel Dep. 99:15-99:19 ("Yeah, my lawyer told me that [a *lis pendens*] would stop the sale.").

1, 2021, defendant removed the case to this Court, *see id.*, and brought three counterclaims against plaintiff: 1) unjust enrichment, on the grounds that defendant allowed plaintiff to rent the Property below market value from 2016 through 2020 to offset any amount owed to him for assisting with general contracting work, but that he has unjustly retained this benefit and only increased his demand for the amount owed to him; (2) tortious interference with contract, based on plaintiff's filing a lawsuit and *lis pendens* that prohibited defendant from completing a sale of the property; and (3) conversion, also based on a theory that plaintiff interfered with defendant's rights in the property by interfering with the pending sale. *See* Def.'s Counterclaim [Dkt. # 2] ("Counterclaim") ¶¶ 38–61.

On February 2, 2022, plaintiff filed an amended complaint. Am. Compl. [Dkt. # 17]. It includes claims for: (1) a declaration that plaintiff "has a right to 30% interest in the proceeds of the sale, plus reimbursement of his costs in the amount of $49,610.32, to be taken from the remaining 70% of the sale proceeds;" (2) breach of contract, alleging that the parties "agreed that [plaintiff] would manage and renovate the property" in exchange for "30% of the profit whenever it was sold," as well as a breach of the alleged agreement that "upon the proceeds of any sale, [plaintiff] would recoup his own personal funds he spent on renovation;" (3) breach of the legal duties owed as a member of a partnership allegedly formed when the parties "agreed to invest in real estate together," and (4) conversion, based on the theory that plaintiff invested personal funds in the Property and partnership without receiving reimbursement from defendant. Am. Compl. ¶¶ 50–68. Plaintiff seeks $250,000 in money damages, or an amount the Court deems reasonable,

as well a declaration that plaintiff has a 30% interest in the proceeds of the sale of the Property and a right to recoup his performance costs to date.  *See* Am. Compl. at 9.[10]

## LEGAL STANDARD

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. Dist. of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact*." Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is

---

10      In both his original complaint and the amended complaint, plaintiff also requested that the Court "issue a preliminary injunction against any contract on the home going to close before this matter is decided."  Compl. [Dkt. # 1-2] at 9; Am. Compl. at 9.  He further stated that he "will take efforts to put that motion on for a hearing as soon as possible."  Compl. at 9; Am. Compl. at 9. But as the record reflects, plaintiff never filed a motion for a preliminary injunction in this Court with his amended complaint.

insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

### I.    Count Two of Plaintiff's Complaint: Breach of Contract

Count Two alleges a breach of contract based on allegations that the parties agreed that plaintiff "would manage and renovate the property, and in exchange for this service, [defendant] would provide [plaintiff] with 30% of the profit whenever it was sold." Am. Compl. ¶ 52. Plaintiff also alleges a breach of their agreement that "upon the proceeds of any sale, [plaintiff] would recoup his own personal funds he spent on renovation." Am. Compl. ¶ 52. Plaintiff has moved for partial summary judgment as to liability on this count, arguing – somewhat remarkably after his meandering deposition – that there is no genuine dispute of material fact that the parties had either an oral or implied-in-fact contract and that defendant breached this contract by repudiating plaintiff's "rights to reside in the property, recover his investment in the property, and enjoy in the profit of that investment." Pl.'s Mot. 13–14. Defendant opposes plaintiff's motion and seeks summary judgment on this count, arguing that the evidence shows that the parties did not reach any agreement whatsoever. Def.'s Cross-Mot. at 6–11. The Court agrees with the defendant that the undisputed evidence shows that the parties never formed a contract.

To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009), citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also Jia Di Feng v. See–Lee Lim*, 786 F. Supp. 2d 96, 104 (D.D.C. 2011) (citations omitted).   "[F]or an enforceable agreement to exist . . . there must be both (1) agreement as to all material terms and (2) intention of the parties to be bound." *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F.Supp.2d 89, 94 (D.D.C. 2004), quoting *Georgetown Ent. Corp. v. District of Columbia,* 496 A.2d 587, 590 (D.C. 1985).   Under District of Columbia law, "the party asserting the existence of a contract has the burden of proof on that issue."  *Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995).   An implied-in-fact contract "is a true contract that contains all the required elements of a binding agreement," and "differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 176 (D.C. 1996) (citations omitted).

Plaintiff attempts to characterize the alleged contract in many ways, but he said it best in his testimony:  "[t]here was not an exact plan."  Capel Dep. at 28:11–29.  Regardless of whether the contract was oral or implied, plaintiff has failed to establish the lack of a genuine dispute as to the elements of a breach of contract claim (or the presence of a genuine issue of material fact to defeat defendant's motion) because he has not presented any evidence that the parties agreed to any – let alone *all* – of the material terms, or demonstrated an intention to be bound.  The "material terms" of a contract include "subject matter, price, payment terms, quantity, quality, and duration," and these terms must be "sufficiently definite" so that "the promises and performance to be

rendered by each party are reasonably certain." *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990).  To meet this standard, the terms of the contract must be "clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (internal citations and quotations omitted).  And "[t]o be final, contract negotiations must include all of the terms which the parties intended to resolve; material terms cannot be left to future settlement." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981).

Here, while plaintiff characterizes the evolving series of agreements he allegedly made with defendant in a variety of ways, the evidence – in particular, the plaintiff's own testimony – shows that the parties never agreed with reasonable certainty as to "all material terms" of the alleged agreements.  Plaintiff alleges that the parties agreed from the start that he would receive 30% of the profits of any eventual sale for "manag[ing] and renov[ating] the property."  Am. Compl. ¶ 52.  But his changing descriptions surrounding the purchase and use of the Property reflect the indefinite nature of this alleged agreement.  First, plaintiff disputes that the defendant searched for a home on her own, Pl.'s Resp. SOF ¶¶ 10, 16–17, and he claims that the parties reached a verbal agreement in the car on the way to an open house – on an unspecified date, at an unspecified location – that "[i]n the event they decided to sell the property" he would be entitled to thirty percent of the profits.  Pl.'s SOF ¶ 7; Pl.'s Resp. to Def.'s Interrog. at 15.  But he testified in his deposition that the parties never discussed if the house would be sold, when it would be sold, or the type of "profit" they would earn.  Capel Dep. at 27:8–30:5.  Alongside these indefinite terms, plaintiff also cannot define another material term of the agreement:  its duration.  The testimony concerning whether and when the house would be sold is quite vague, and it undercuts his suggestion that he was assigned to "manage and renovate the property" in consideration for a future

18

stake, Am. Compl. ¶ 52, as he testified that he originally intended that he and the defendant would stay at the house "forever" or that the two of them would eventually "sell it and . . . move to a different neighborhood . . . [or] buy a bigger house."  Capel Dep. at 28:11-29:11.  Given this lack of clarity surrounding his own intentions, much less the parties' shared expectations, the evidence does not support the parties' intention to be bound as to this aspect of the contract.

Plaintiff points to evidence that the parties agreed that he "would make the mortgage payments," citing his own deposition testimony and responses to defendant's interrogatories.  Pl.'s Mot. at 10.  But he explained in his deposition that that he would pay defendant monthly, and she then paid the actual mortgage; plaintiff also testified that his name was never added to the mortgage or deed for the house.  Capel Dep. at 40:1–41:16.  Plaintiff cannot create support for his alleged contract by simply labeling the monthly payments to plaintiff as "mortgage payments" instead of "rent" on a spreadsheet.  *See* Ex. F to Pl.'s Reply at CAP0304–CAP0322 (plaintiff's spreadsheet listing his house expenses and describing monthly payments to defendant as "[m]ortgage payment[s]").  Moreover, even if there was undisputed evidence that plaintiff paid the mortgage, that alone would not provide enough evidence of a contract according him a 30% stake in the property.

Nowhere in the record is there any indication that the parties agreed to sufficiently definite terms at the outset that he would be entitled to thirty percent of profits upon the sale of the property. This may have been plaintiff's expectation all along, or the amount may have made its first appearance when plaintiff began demanding money before he would move out, but in either event, he has not come forward with evidence that could carry his burden to show the existence of a contract with definite terms.

The second agreement that plaintiff seeks to enforce – the agreement that he would be reimbursed for the funds he spent on renovations – may have been part of the parties' shared general understanding, but plaintiff has not shown agreement on the material terms of this alleged agreement either; indeed, his description of this agreement changes over time. He first claims that the parties agreed that he would "recoup his share of renovation costs" at the same unspecified time they agreed to purchase the house together on the way to an open house. Pl.'s SOF ¶ 8. But his deposition testimony contradicts this, as plaintiff testified that the parties never discussed that he would be repaid for the renovation costs and never talked about getting his construction expenses back. Capel Dep. at 54:15–55:13. Notwithstanding this testimony, he testified that he was going to be reimbursed for his renovation expenses "[a]s part of the profits" earned when defendant eventually sold the Property. Capel Dep. at 54:15–56:16. His expectations do not provide evidence for an agreement, and his subsequent testimony that they "just poured money into the house and that's it" and that "we were not thinking about, you know, what am I going to get, or what is she going to get," Capel Depo at 56:3-56:16, further underscores the lack of precision surrounding the materials terms of this alleged agreement or a mutual intention to be bound.

The fact that plaintiff's reimbursement estimates changed over time also shows that the parties never agreed to a figure. At different points in 2017, 2018, and 2019, and then again when he sat for his deposition, his claimed renovation costs bounced around between $25,000 and $49,000, and he conceded that he could not verify much of the total with receipts because he often paid cash. *See* Pl.'s Dep. at 227:18–20 (testifying to $30,000 to $35,000 in renovation costs); July 2018 Emails (estimating that he spent between $25,000 and $30,000); Def.'s SOF ¶ 53 (stating that plaintiff provided receipts "in support of his supposed $49,000 expenditures," but that these

receipts corresponded to costs that the defendant or contractors had previously paid).  While it is clear from the record that the defendant asked on several occasions how much the plaintiff had spent on labor and materials, which the plaintiff could have read as assurances of reimbursement, those implied assurances alone are not sufficient to create a contract the Court can enforce.

Similarly, while text messages and emails throughout 2018 and 2019 show that the plaintiff proposed that defendant "buy him out," that defendant responded, and that she also discussed plaintiff's proposed settlement, these communications simply reflect plaintiff's expectations and demands that he be paid, and defendant's potential interest in a resolution, not that there was some pre-existing mutual understanding that he would have a stake in the equity of the home, or how much he would be paid if it was sold.  Defendant asks follow-up questions to plaintiff's reference to a "buy out" rather than confirming a previous understanding or agreeing to his suggestion.  *See* Pl.'s SOF ¶ 14; Def.'s Resp. SOF ¶ 14 (defendant sent plaintiff a text on April 20, 2017, stating, "[w]hat do you mean buy you out?"); *see also* July 2018 Emails ("[w]hen you say buy you out how much are you thinking?").  In addition, defendant responded to plaintiff's proposed settlement figures in the July 1, 2019 text messages with:  "You don't have any interest in the property either way. Real estate is contract law. I'm just doing this to be nice."  Pl.'s Resp. to Def.'s Interrog. at 4.  As "material terms cannot be left to future settlement," *Flynn Co.*, 431 A.2d at 547, these settlement discussions do not satisfy plaintiff's need to prove the existence of a prior agreement.

The only "agreement" for which there is vague support in the record is with respect to plaintiff's assistance in overseeing the renovation, as defendant admits that the parties "agreed that she would compensate him for his efforts [with the renovation] whenever she sold the home." Def.'s SOF ¶ 41.  But there is no evidence as to when that agreement was made, or what key terms were agreed upon – in particular, how much plaintiff would be paid, and whether that would be

computed as a percentage of the renovation costs, a percentage of the proceeds of the sale, or a flat fee. While plaintiff now talks about 30% of the profits, the only percentage defendant mentions is plaintiff's supposed suggestion of 10 to 15% of the renovation cost as a fair management fee. Def.'s SOF ¶ 24.

Because plaintiff, who carries the burden of proving the existence of the contract, cannot begin to do so on this record, the Court will deny his motion for partial summary judgment. And since he has failed to identify a genuine dispute of material fact that would preclude the grant of summary judgment in defendant's favor on the grounds that the parties never formed a contract, the Court will deny plaintiff's motion for summary judgment and grant defendant's cross-motion for summary judgment as to Count Two.

## II.    Count Three of Plaintiff's Complaint: Breach of Partnership Duties

In Count Three, plaintiff alleges that he and the defendant "entered into a general partnership when they agreed to invest in real estate together," and that defendant breached her duties of loyalty and care under D.C. Code § 29-604.07 when she "repudiated Mr. Capel's interest in the partnership and his right to a portion of the partnership profits." Am. Compl. ¶¶ 60–63. Defendant argues that she is entitled to summary judgment on this claim because the record cannot support a finding that the parties formed a partnership. Def.'s Cross-Mot. at 11. The Court will grant summary judgment in favor of the defendant on this count as well.

Under District of Columbia law, "[w]hile the partnership relation has been variously defined, traditionally it is formed 'when two or more competent persons [contract] to place their money, effects, labor, and skill or some or all of them, in lawful commerce or business, and to divide profit and bear the loss in certain proportions.'" *Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990) (internal citation omitted); *see also* D.C. Code § 29-602.02 ("the association of 2 or

more persons to carry on as co-owners of a business for profit shall form a partnership, whether or not the persons intend to form a partnership.").  For a partnership to exist, "two or more persons must intend to associate together to carry on as co-owners for profit." *Beckman*, 579 A.2d at 627. While the "manner in which the parties themselves characterize the relationship is probative, the question ultimately is objective: did the parties intend to do the acts that in law constitute partnership?" *Id.* (internal citation and quotations omitted).  To determine this objective intent, courts "look for the presence or absence of the attributes of co-ownership, including profit and loss sharing, control, and capital contributions." *Id.*

Just as the evidence does not support the existence of the parties' intention to form a contract, plaintiff has not come forward with evidence that reflects an intent to form a partnership. While plaintiff alleges that the parties entered into a partnership "for the purpose of investing in real estate," Am. Compl. ¶ 63, he has not pointed to any contemporaneous evidence to support this theory.  His own testimony is all over the map when he is asked about his expectations and intentions at the time, and it undermines any finding that the parties' agreed purpose was "investing in real estate" as opposed to occupying a shared home.  Plaintiff testified that the parties never discussed if the house would be sold, when it would be sold, or the type of profit they expected to earn; rather, his original thought was that he and the defendant would stay at the house "forever" or that the two of them would "sell it and . . . move to a different neighborhood . . . [or] buy a bigger house."  Capel Dep. at 27:8–30:5; 37:18–38.

Moreover, setting aside plaintiff's characterization of the relationship, the record reflects an absence of any of the attributes of co-ownership.  The house was titled in defendant's name only, she was obligated on the mortgage, and she paid the bank and the real estate taxes.  Def.'s

SOF ¶ 18; Pl.'s Resp. SOF ¶ 18.  There is no evidence that the rental receipts from tenants who moved in after plaintiff moved out were shared.

Finally, the parties did not manifest an intention to operate the Property together as a business venture for profit by putting anything of that nature in writing.  The record does not include contemporaneous records showing that the two kept track of their expenditures – or any reimbursements – while the renovation was underway, and there has been no showing that the objective of the renovation effort was to turn a profit.  There are no records that reflect that plaintiff submitted receipts for reimbursement to the defendant, and no check stubs that reflect that any were paid.  The sloppy and haphazard nature of what little there is, and the dearth of any indicia of regularly conducted operations leaves plaintiff unable to prove that the home improvement effort was originally intended to be a for-profit business at all.

While the existence of a partnership "turn[s] less on the presence or absence of legal essentials than on the intent of the parties gathered from their agreement, conduct, and the circumstances surrounding their transactions," *Beckman*, 579 A.2d at 628, the undisputed material facts do not support the existence of a partnership between the parties for the purpose of investing in real estate.  As plaintiff stated, "we were not thinking about, you know, what am I going to get, or what is she going to get; we did this as a couple."  Capel Depo at 56:3-56:16.  Since plaintiff has not come forward with evidence that could create a triable issue on the formation of a partnership, there could not have been a breach of the duties owed by virtue of the partnership, and the Court finds that the defendant is entitled to summary judgment as to Count Three.

### III.   Count Four of Plaintiff's Complaint: Conversion

In Count Four, plaintiff alleges that he "invested a significant amount of his own personal funds into the property and into the partnership," and that defendant's "repudiation of her

24

obligation to repay those funds amounts to a conversion" of his "financial investment."  Am. Compl. ¶¶ 66–67.  Because the Court has already found that plaintiff has failed to produce evidence that would establish the existence of a partnership, defendant is also entitled to summary judgment on any conversion claim based on plaintiff's "financial investment" in the alleged partnership. What remains, then, is plaintiff's claim that his "financial investment" into the property was converted by the defendant.  Am. Compl. ¶¶ 66–67.

Defendant argues that she is entitled to summary judgment on plaintiff's conversion claim because without a contract or partnership agreement, "any claim to recoup these figures is a purely tort claim of conversion and subject to a three-year statute of limitations from the date of the violation."  Def.'s Cross-Mot. at 19.  Because "any claimed conversion of [p]laintiff's funds spent on the renovations occurred in 2013 and 2014 when they were spent without reimbursement," according to the defendant, plaintiff's claim for the alleged conversion of his unreimbursed renovation expenses is time barred.  Def.'s Reply at 15.

The statute of limitations governing a claim for conversion is three years.  *See* D.C. Code § 12-301; *see also Forte v. Goldstein*, 461 A.2d 469, 472 (D.C. 1983).  But "a claim for conversion accrues when the plaintiff demands the return of the property and the defendant refuses." *Malewicz v. City of Amsterda*m, 517 F. Supp. 2d 322, 335 (D.D.C. 2007), citing *In re McCagg*, 450 A.2d 414, 416 (D.C. 1982).  In this case, there were alleged requests for payment on a variety of dates, beginning as early as 2016, and the amounts requested varied as well.  *See* Def.'s SOF ¶¶ 39–41 (plaintiff refused to move out unless defendant paid him $25,000, which he considered the "contracting fee for the renovations he helped with years before."); Capel  Dep. at 227:18–20 (testifying that sometime in 2017, he told defendant that his renovation costs were $30,000 to $35,000); Pl.'s Resp. to Def.'s Interrog. at 4 (June 2019 text message from plaintiff proposing they

"settle at 64k"); *see also* Def.'s SOF ¶ 53 (stating that plaintiff provided defendant with receipts in the fall of 2019, but defendant did not pay him).

It is harder to pinpoint, though, when each of these alleged demands was refused. Defendant disputes the existence of some of them, but the record reflects a series of efforts to negotiate some sort of compromise. *See* Def.'s SOF ¶ 44 (in 2016, defendant "informed Mr. Capel that she would compromise with him paying a small increase of rent to $2,850 . . . contingent that the difference between the $2,850 and the market rate of $3,250 would offset against the fee they would eventually settle on"); Pl.'s SOF ¶ 14; Def.'s Resp. SOF ¶ 14 (April 20, 2017 text message from defendant to plaintiff asking, "[w]hat do you mean buy you out?"); Pl.'s Resp. to Def.'s Interrog. at 4 (July 1, 2019 text message from defendant to plaintiff stating, "You don't have any interest in the property either way. Real estate is contract law. I'm just doing this to be nice.")

But it is not necessary to fix the date of the latest denial, because even if plaintiff can point to a communication in which defendant responded negatively to his requests within the limitations period, he cannot make out a conversion claim.

Under D.C. law, conversion is defined as "an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." *Wash. Gas Light Co. v. Pub. Serv. Comm'n of D.C.*, 61 A.3d 662, 675 (D.C. 2013), quoting *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011). Typically, conversion claims relate to objects or chattel, and the courts in this district have repeatedly held:

> Money can be the subject of a conversion claim only if the plaintiff has the right to a specific identifiable fund of money. A cause of action for conversion, however, may not be maintained to enforce a mere obligation to pay money.

*Curaflex Health Servs., Inc. v. Bruni*, 877 F. Supp. 30, 32 (D.D.C. 1995) (citations omitted); *see also Cannon v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 152, 176 (D.D.C. 2013). This means that

26

the Court must "determine whether plaintiff has a property interest in that money, such that an action for conversion is proper, or simply a contractual right." *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013).

In *McNamara,* the court found that the plaintiff had not established "that he personally contributed a certain amount of money to the partnership to be used for partnership activities and that [defendant] improperly used *those exact funds* . . . ," so he had not pointed to an "identifiable fund of money" for a conversion claim. *Id.* at 195 (emphasis in original). And since McNamara's claim to the funds was premised on his argument that Picken violated the terms of their partnership agreement by misusing funds to pay off debts, the court concluded that the claim was more properly construed as a breach of contract claim, and that the plaintiff could only seek recovery of that money under his claim for breach of the partnership agreement. *Id.*; *see also Curaflex Health Servs., Inc. v. Bruni,* 877 F. Supp. at 35 (granting motion for summary judgment and dismissing conversion claims because defendant's "obligations to plaintiff were contractual and nothing more.").

Here, plaintiff has not established the right to a specific, identifiable fund of money. He has not stated with clarity how much he invested in the renovations: how much he paid, when, and to whom. He readily admits that he lacks records to verify the payments, so there is nothing in the record, and surely not undisputed evidence in the record, of how much he spent and whether he got any or all of it back. And he is not even clear that when he spent the money, he was expecting to get it back; that expectation may have arisen later, when it became clear that he and Ms. Wright were no longer going to enjoy the house they worked on together. So with no evidence of what could have been converted, all that is left would be claims for breach of contract, or the partnership agreement, which have already been addressed.

Moreover, even if plaintiff had established that defendant had a property right in some amount of money that he advanced on behalf of the renovation project, "such fungible cash is precisely the type of fund that may not underlie a claim for conversion." *McNamara*, 950 F. Supp. 2d at 195 (granting summary judgment on claim for conversion where plaintiff "argue[d] only that general partnership funds—which were derived in part from services he provided—were misdirected").

For all of the reasons detailed above, the Court will grant defendant's cross-motion for summary judgment as to all of plaintiff's claims.[11]

## IV.   Count Two of Defendant's Counterclaim: Tortious Interference

In Count Two of defendant's counterclaim, defendant alleges that plaintiff tortiously interfered with her contract to sell the Property by filing a lawsuit and a *lis pendens* to prevent the sale of the Property.   Counterclaim ¶¶ 44–50.   To establish a prime facie case of tortious interference, one must demonstrate the following:   "(1) existence of a valid contractual or other business relationship;   (2) the defendant's knowledge of the relationship;   (3) intentional interference with that relationship by the defendant; and (4) resulting damages."   *Onyeoziri v. Spivok*, 44 A.3d 279, 286–87 (D.C. 2012), citing Restatement (Second) of Torts § 766 (1979). Under District of Columbia law, "instead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008). A defendant "may avoid liability if he can establish that his conduct was legally justified or

---

11      Given the lack of any enforceable contract or partnership agreement, as well as plaintiff's failure to show any legal entitlement to the proceeds of the sale, plaintiff's claim for declaratory relief in Count One falls as well.   The Court will therefore grant defendant's cross-motion for summary judgment on Count One.

privileged." *Onyeoziri*, 44 A.3d at 286 (internal citations and quotations omitted).  Once the plaintiff has established a prima facie case of tortious interference, the burden shifts to the defendant to establish that the interference was "legally justified or privileged." *Id.* at 287 (internal citations and quotations omitted).

Plaintiff does not dispute the existence of a valid contract between the defendant and an interested buyer to sell the Property or that he had knowledge of it; he also implies that the defendant may have suffered some amount of damages.  *See* Pl.'s Reply at 17 ("To the extent the [d]efendant has actually been injured by the cancellation of the sale, she certainly did not take all reasonable steps to mitigate those damages.").  Plaintiff also testified that he knew that a *lis pendens* would block the sale of the property from being finalized.  *See* Capel Dep. 99:15-99:19 ("Yeah, my lawyer told me that [a *lis pendens*] would stop the sale.").

The parties disagree about plaintiff's motive behind the interference, which is the "key consideration" under D.C. law.  *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 346 (D.C. 2015).  Defendant argues that she is entitled to summary judgment on this count because plaintiff was aware that the Property was under contract to be sold and that his actions would prevent the sale, so he "baselessly alleg[ed] an interest in the property" when he "knew or reasonably should have known that any reimbursement he was purportedly entitled to was a mere debt."  Def.'s Cross-Mot. at 21.  Plaintiff opposes defendant's motion, arguing that his litigation efforts were not improper, and that he filed the *lis pendens* in good faith, so his interference fell under a conditional privilege.  Pl.'s Reply at 15–19.

In *Havilah*, the D.C. Court of Appeals recognized a "conditional privilege" of *lis pendens* filings as a defense for claims of tortious interference:

> We hold that, in the District of Columbia, the act of engaging in litigation
> is conditionally privileged against a claim of tortious interference with

contract and/or prospective advantage, meaning that it is a complete defense to such a claim if the defendant can establish that the prior litigation asserted a legally protected interest in good faith. If the prior litigation was pursued in good faith and therefore privileged, then the filing of a *lis pendens* ancillary to that litigation is also privileged.

\* \* \* \*

In fact, Restatement (Second) of Torts § 773 (1979), explicitly recognizes as an affirmative defense only interfering conduct amounting to a "bona fide claim," i.e.,

> [o]ne who, by asserting *in good faith* a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another *does not interfere improperly* with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Havilah*, 108 A.3d at 339, 346 (emphasis in original).  The court explained that "[t]his means that a defendant may avoid liability if he or she can establish that the notice of *lis pendens* was filed pursuant to litigation that was initiated in good faith."  *Id.* at 346 (citations omitted).  "Whether the underlying litigation was undertaken in good faith is a question of fact for the jury to decide."  *Id.*

The Court recognizes that while plaintiff's claims in the litigation remain unsupported, the factual question of his good faith in pursuing the lawsuit is less amenable to summary judgment. However, while plaintiff correctly argues that under *Havilah*, the conditional privilege would provide a defense to both the lawsuit and the *lis pendens* if the lawsuit itself was "asserted in good faith," his argument fails to consider the part of the privilege that is missing in his case:  he must "establish that the prior litigation asserted a *legally protected interest* in good faith."  *Havilah*, 108 A.3d at 339 (emphasis added).  This defense "is of narrow scope," and "protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means."  *Onyeoziri v. Spivok*, 44 A.3d at 288, citing

30

*NCRIC*, 957 A.2d at 901, quoting Restatement § 773.[12]  For the reasons discussed above, plaintiff

has failed to show that any evidence in the record gives him a legally protected *interest in the*

*Property*.   At best, he has pointed to conversations in which defendant appears to have

acknowledged a willingness to pay him some money, either for renovation expenses or the time

and effort he expended on some of the management tasks related to the renovation.[13]  The fact that

at one point, defendant indicated she might pay the plaintiff out of the proceeds of an eventual sale

explains where the money might come from, but that did not give the plaintiff an ownership stake

in the Property itself.  Indeed, the parties were musing about her taking out a loan for that purpose

as well.  Thus, the conditional privilege therefore does not provide plaintiff with a defense to the

counterclaim for tortious interference.

　　Ultimately, plaintiff "bears the burden of proving that [his conduct] was not [wrongful]."

*NCRIC*, 957 A.2d at 901.  He has failed to meet that burden here, and the Court will grant

defendant's cross-motion for summary judgment in part with respect to plaintiff's liability on

---

12      The *Onyeoziri* test predates the court's opinion in *Havilah*, and the *Havilah* opinion
includes the "legally protected interest" language in at least two places.  While the opinion did not
also include those words in its conclusory sentence, "[t]his means that a defendant may avoid
liability if he or she can establish that the notice of *lis pendens* was filed pursuant to litigation that
was initiated in good faith,"  *Havilah,* 108 A. 3d at 346, the Court does not read *Havilah* as
replacing the test, but rather as reiterating the need to "establish that the prior litigation asserted a
legally protected interest," *id.* at 339, as other courts in this district have done.  *See Vantage*
*Commodities Fin. Servs. I, LLC v. Willis Ltd.*, 531 F. Supp. 3d 153, 179–80 (D.D.C. 2021); *see*
*also Legal Tech. Grp., Inc. v. Mukerji*, Civil Action No. 17-631 (RBW), 2019 WL 9143477, at
*17 (D.D.C. June 10, 2019); *707 G St. Rest., LLC v. Jemal's Mickelson, LLC*, Civil Action No.
20-685 (RMM), 2023 WL 2571753, at *9 (D.D.C. Mar. 20, 2023).

13      Notably, plaintiff has never alleged that he paid one penny towards the purchase of the
property.  In his motion for preliminary injunctive relief filed in connection with the original
complaint, all plaintiff could say was:  "The parties were in a romantic relationship for many years.
During that time, they bought an investment property together. Defendant is the only person named
on the deed. Plaintiff invested a tremendous amount of time and money renovating and maintaining
the property. Now, Defendant has repudiated their agreement on his rights to the proceeds of the
sale and has entered into a contract for sale on the property."  *See* Ex. A to Notice of Removal
[Dkt. # 1-2].

Count Two of the counterclaim.  The Court will deny defendant's cross-motion for summary judgment on this count with respect to damages, as the issue of damages has yet to be determined.[14]

## V.    Count Three of Defendant's Counterclaim: Conversion

Defendant also brings a counterclaim for conversion, alleging that plaintiff intentionally interfered with her dominion and control of the Property by filing the lawsuit and *lis pendens*. Counterclaim ¶¶ 51–59.  She argues that she had a right to sell her Property as its sole owner, and that defendant "interfered with and deprived [her] of possession and/or use of her Property."  Def.'s Cross-Mot. at 23.

As previously stated, under District of Columbia law, the tort of conversion requires "an unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property."  *Dennis v. Edwards*, 831 A.2d 1006, 1013 (D.C. 2003), quoting *Blanken v. Harris, Upham, & Co., Inc.*, 359 A.2d 281, 283 (D.C. 1976).  "Personalty" is defined as "[p]ersonal property as distinguished from real property."  *See Personalty*, Black's Law Dictionary (12th ed. 2024).  In the District of Columbia "the law of conversion does not apply to real property."  *Dixon v. Midland Mortg. Co.*, 719 F. Supp. 2d 53, 56–57 (D.D.C. 2010) (granting motion to dismiss conversion claim because plaintiff's "leasehold interest in her home is the subject matter of real property," and the D.C. law of conversion does not apply to real property); *see also Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 150 (D.D.C. 2011) (finding that claim for conversion of residential property could not survive summary judgment because D.C. law does

---

14      Defendant's counterclaim alleges that she "has already incurred $17,000 in damages from her efforts to make the Property ready for sale and will continue to incur additional damages for as long as the Property is vacant. She additionally will potentially receive a significantly lower sale price when she is ultimately able to secure a new buyer."  Counterclaim ¶ 59.  Defendant has not established the amount of damages incurred, and she still owns the property and can sell it once the *lis pendens*, which now lacks any legal underpinning, is lifted.

not apply to real property); *249 Mo. Ave. Cmty. Dev. LLC v. PHH Mortg. Corp.*, Civil Action No. 22-2678 (CRC), 2023 WL 5133202, at *4 (D.D.C. Aug. 9, 2023) (citations and quotations omitted) ("As an initial matter, it is black letter law that in the District of Columbia, the law of conversion does not apply to real property. So any of Plaintiff's allegations involving conversion of the [real] Property itself must be dismissed.").

Because the District of Columbia does not recognize claims for the conversion of real property, defendant's cross-motion for summary judgment on Count Three of her counterclaim is denied.  Moreover, while plaintiff has not moved for summary judgment on this count, the Court finds it appropriate to *sua sponte* enter summary judgment for plaintiff on Count Three of defendant's counterclaim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.").

## CONCLUSION

For the foregoing reasons, plaintiff Capel's motion for partial summary judgment on Count Two [Dkt. # 20] is **DENIED,** and defendant's cross-motion for summary judgment [Dkt. # 22] is **GRANTED** with respect to **Count One, Count Two, Count Three,** and **Count Four**.  With respect to defendant's counterclaim, defendant's cross-motion for summary judgment is **GRANTED** in part with respect to liability on **Count Two,** and **DENIED** as to **Count Three**. The Court will also *sua sponte* **GRANT** summary judgment for plaintiff on **Count Three** of defendant's counterclaim.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 27, 2024